# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# WACO DIVISION

|  |  |
|---|---|
| **POWERMAT TECHNOLOGIES LTD.,** an Israel Limited Liability Company,<br><br>                    Plaintiff,<br>**v.**<br><br>**SHENZHEN KAIXINGHUI TECHNOLOGY CO., LTD. d/b/a YOOTECH,**<br>A China corporation,<br><br>                    Defendant. | **Case No. 6:21-cv-725**<br><br>*INJUNCTIVE RELIEF REQUESTED*<br><br>*JURY TRIAL DEMANDED* |

## COMPLAINT

## I.  PARTIES

1.     Plaintiff Powermat Technologies Ltd. ("Powermat") is an Israel limited liability company with its principal place of business located at 94 Derech Shlomo Shmeltzer, Bldg. Alon B, Kiryat Arie, Petah Tivka 4970602, Israel. Powermat is the owner of the intellectual property asserted against Defendant in this action.

2.     Upon information and belief, Defendant Shenzhen Kaixinghui Technology Co., Ltd. d/b/a Yootech ("Yootech" OR "Defendant") is a Chinese corporation having its principle office at 2/F, G Bldg, Heng Chang Rong Xinghui Science And Technology Industrial Park, No.52 Huaning Road, Xinshi Community. Dalang Street, Longhua District, Shenzhen, Guangdong China.

## II.  JURISDICTION AND VENUE

3.     This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*, thus this Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331 and 1338.

4.     This Court has personal jurisdiction over the Defendant because Defendant markets, distributes offers for sale and/or sells infringing products throughout the United States including to customers within this judicial district. This Court has also specific personal jurisdiction over Defendant, because, as described more thoroughly herein, it purposefully availed itself to, and enjoys the

benefits of, the laws of Texas, it had sufficient minimum contacts with the State of Texas and this District, this action arises out of these contacts, and exercising jurisdiction over Defendant would be reasonable and comport with the requirements of due process.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## III.    FACTUAL BACKGROUND

## A.    Asserted Intellectual Property

6.      Powermat started in 2006 to change the way people consume power by doing away with cables and providing seamless access to power anywhere and anytime. Since then, Powermat has invested well over $100 Million in research and development related to wireless charging. Powermat is one of the pioneers of inductive charging.

7.      Powermat has also participated in worldwide efforts to standardize wireless charging including, for example, through the Wireless Power Consortium ("WPC") organization that created the Qi wireless charging standard ("Qi-standard"). Powermat is identified on the WPC web site as one of the few entities in the world having a licensing program related to the Qi-standard. The Qi-standard is the most widely used wireless charging technology in the world for use in consumer electronics and smartphones today.

3

8.      As a result of its innovative charging technology, Powermat has been awarded a number of patents related to inductive charging.

9.      U.S. Patent No. 9,006,937 (the "'937 patent") titled "System and Method for Enabling Ongoing Inductive Power Transmission" was duly and legally issued on April 14, 2015. The '937 Patent is a division of U.S. Patent No. 8,981,598 which was filed on August 9, 2011 and which is in turn a continuation-in-part of U.S. Patent No. 8,188,619 which was filed on July 2, 2009. The '937 Patent also claims priority to U.S. Provisional Application No. 61/129,526 which was filed on July 2, 2008 and U.S. Provisional Application No. 61/129,859 which was filed on July 24, 2008. A true copy of the '937 Patent is attached hereto as Exhibit A.

10.     Powermat is the owner of all right, title and interest in the '937 patent, including the right to sue and recover for past infringement.

11.     U.S. Patent No. 9,048,696 (the "'696 patent") titled "Transmission-Guard System and Method for an Inductive Power Supply" was duly and legally issued on June 2, 2015. The '696 Patent is a division of U.S. Patent No. 9,136,734 which was filed on September 16, 2010 and which in turn a continuation of PCT/IL2008/0016141 which was filed on December 18, 2008. The '696 Patent also claims priority to U.S. Provisional Application No. 61/064,618 which was filed on March 17, 2008, U.S. Provisional Application No. 61/129,526 which was filed on March 17, 2008, U.S. Provisional Application No. 61/129,526 which was

filed on July 2, 2008, U.S. Provisional Application No. 61/129,859 which was filed on July 24, 2008, and U.S. Provisional Application N. 61/129,970 which was filed on Agust 4, 2008. A true copy of the '696 Patent is attached hereto as Exhibit B.

12.     Powermat is the owner of all right, title and interest in the '696 patent, including the right to sue and recover for past infringement.

13.     U.S. Patent No. 9,099,894 (the "'894 patent") titled "System and Method for Coded Communication Signals Regulating Inductive Power Trasnmission" was duly and legally issued on August 4, 2015. The '894 Patent is a division of U.S. Patent Application No. 8,981,598 which was filed on August 9, 2011 and which is in turn a continuation-in-part of U.S. Patent No. 8,188,619 which was filed on July 2, 2009. The '894 Patent also claims priority to U.S. Provisional Application 61/129,526 which was filed on July 2, 2008 and U.S. Provisional Application No. 61/129,859 which was filed on July 24, 2008. A true copy of the '894 Patent is attached hereto as Exhibit C.

14.     Powermat is the owner of all right, title and interest in the '894 patent, including the right to sue and recover for past infringement

## B.   Defendant's Infringing Products and Activities

15.     Defendant markets, manufactures, distributes, imports, offers for sale, sells, advertises, and promotes a "Yootech Wireless Charger, Qi-Certified 10W

Max Fast Wireless Charging Pad Compatible with iPhone 12/12 Mini/12 Pro Max/SE 2020/11 Pro Max,Samsung Galaxy S21/S20/Note 10/S10, AirPods Pro (No AC Adapter)" on at least Amazon (see, https://www.amazon.com/Wireless-Qi-Certified-Charging-Compatible-Qi-Enabled/dp/B079KZ49PJ) as shown in the image below:



Upon information and belief, Defendant also sells this product at brick and mortar stores throughout the United States. This charger shall be referred to as "Defendant's Product."

16.     Defendant's Product is Qi-certified and therefore complies with the Qi-standard. This is confirmed by the name of the product which states that it is

"Qi-Certified" as well as by the product itself which contains the Qi logo as shown in the image below:



### 1.    U.S. Patent No. 9,006,937

17.    Claim 1 of the '937 patent reads:

> 1. An inductive power receiver operable to receive power from at least one inductive power outlet and to provide power to an electric load, the inductive power receiver comprising:
>
> at least one secondary inductive coil for forming an inductive couple with at least one primary inductive coil associated with the at least one inductive power outlet;
>
> a signal transmitter operable to provide feedback signals for the inductive power outlet; and
>
> a regulator operable to compare power received by the inductive power receiver with reference values and to select instruction signals accordingly;

wherein the inductive power receiver is operable to send a perpetuation signal for the inductive power outlet when the power received lies within a permissible range of values, the perpetuation signal for instructing the inductive power outlet to continue driving the primary inductive coil at the same power level.

18.     "An inductive power receiver operable to receive power from at least one inductive power outlet and to provide power to an electric load, the inductive power receiver" of Claim 1 constitutes the preamble of the claim and therefore it is not a claim limitation.[1]

19.     Defendant's Product contains "at least one secondary inductive coil for forming an inductive couple with at least one primary inductive coil associated with the at least one inductive power outlet." As shown below, Section 2 of the Qi-standard requires that Defendant's Product include "at least one secondary inductive coil for forming an inductive couple with at least one primary inductive coil associated with the at least one inductive power outlet:"

---

[1] Even if considered a limitation it would be met by the Defendant's product.



A secondary coil for forming an inductive couple with at least one primary inductive coil associated with the at least one inductive power outlet

20.     Defendant's Product contains "a signal transmitter operable to provide feedback signals for the inductive power outlet." As shown below, Section 2 of the Qi-standard requires that Defendant's Product include "a signal transmitter:"



Signal transmitter

And Section 5.3.4 of the Qi-standard requires that the signal transmitter "provide feedback signals for the inductive power outlet" stating "In the power transfer phase, the Power Receiver controls the power transfer from the Power Transmitter, by means of control data that it transmits to the latter."

21.     Defendant's Product contains "a regulator operable to compare power received by the inductive power receiver with reference values and to select instruction signals accordingly." Section 5.1 of the Qi-standard that Defendant's Product complies with states:

> The Power Receiver selects a desired Control Point—a desired output current and/or voltage, a temperature measured somewhere in the Mobile Device, etc. In addition, the Power Receiver determines its actual Control Point. Note that the Power Receiver may use any approach to determine a Control Point. Moreover, the Power Receiver may change the approach at any time during the *power transfer* phase*. **Using the desired Control Point an actual Control Point, the Power Receiver calculates a Control Error Value—for example simply taking the (relative) difference of the two output voltages or currents—such that the result is negative if the Power Receiver requires less power in order to reach it desired Control Point, and positive if the Power Receiver requires more power in order to reach its desired Control Point* . . ..*

(emphasis added).

22.     Defendant's Product meets the limitation "wherein the inductive power receiver is operable to send a perpetuation signal for the inductive power outlet when the power received lies within a permissible range of values, the perpetuation signal for instructing the inductive power outlet to continue driving the primary inductive coil at the same power level." Section 5.3.4 of the Qi-standard that Defendant's Product complies with states that "[t]he Power Receiver shall set the Control Error Value to zero if the actual Control Point is equal to the desired Control Point" thus providing a perpetuation signal for inductive power

when the power received lies within a permissible range of values and the perpetuation signal for instructing the inductive power outlet to continue driving the primary inductive coil at the same power level."

23.    Based on the foregoing, Defendant's Product infringes at least Claim 1 of the '937 Patent.

### 2.    U.S. Patent No. 9,048,696

24.    Claim 1 of the '696 Patent reads:

1. An inductive power outlet operable to transfer power to an inductive power receiver, said inductive power outlet comprising:

a platform for supporting said inductive power receiver;

at least one primary inductive coil embedded in said platform;

an alignment mechanism configured to facilitate alignment between said primary inductive outlet and said inductive power receiver such that an inductive couple is formed between said primary inductive coil and a secondary inductive coil of said inductive power receiver, said inductive couple having a characteristic resonant frequency; and

a driving circuit wired to said primary inductive coil, said driving circuit comprising a switching unit configured and operable to provide an oscillating driving voltage across said primary inductive coil such that a secondary voltage is induced in the secondary inductive coil;

wherein said driving circuit is configured and operable to produce said oscillating driving voltage at a transmission frequency substantially different from said characteristic resonant frequency of said inductive couple.

11

25. "An inductive power outlet operable to transfer power to an inductive power receiver, said inductive power outlet" of Claim 1 constitutes the preamble of the claim and therefore it is not a claim limitation.[2]

26. Defendant's Product contains "a platform for supporting said inductive power receiver" as shown in the image below:



In addition, Section 2 of the Qi-standard that Defendant's Product complies with provides that "Typically, a Base Station has a flat surface—referred to as the Interface Surface—on top of which a user can place one or more Mobile Devices."

27. Defendant's Product contains "at least one primary inductive coil embedded in said platform" as shown below:

---

[2] Even if considered a limitation it would be met by the Defendant's product.



Primary inductive
coil embedded in
the platform

28.    Defendant's Product contains "an alignment mechanism configured to facilitate alignment between said primary inductive outlet and said inductive power receiver such that an inductive couple is formed between said primary inductive coil and a secondary inductive coil of said inductive power receiver, said inductive couple having a characteristic resonant frequency." Section 2 of the Qi-standard that Defendant's Product complies with provides that "there are two concepts for horizontal alignment of the Primary Coil and Secondary Coil." Section 2 of the Qi-standard also shows that an inductive couple is formed between the primary inductive coil and secondary inductive coil due to the horizontal alignment as shown in the image below:



Inductive couple between the primary and secondary couple due to horizontal alignment.

Further, Section 3.2.11.1.4 of the Qi-standard provides that the couple has a characteristic resonant frequency stating "Near resonance, the voltage developed across the series capacitance can reach levels exceeding 100V pk-pk."

29.    Defendant's Product contains "a driving circuit wired to said primary inductive coil, said driving circuit comprising a switching unit configured and operable to provide an oscillating driving voltage across said primary inductive coil such that a secondary voltage is induced in the secondary inductive coil." Section 3.2.6.2 of the Qi-standard that Defendant's Product complies with provides that the "Power Transmitter design A6 uses a half-bride inverter to drive the Primar Coil and a series capacitance." This section also provides the following diagram of this design:



**Figure 3-24: Electrical diagram (outline) of Power Transmitter design A6**

By using this design, the driving circuit has a switching unit configured and operable to provide an oscillating driving voltage across said primary inductive coil such that a secondary voltage is induced in the secondary inductive coil.

30.    Defendant's Product meets the limitation "wherein said driving circuit is configured and operable to produce said oscillating driving voltage at a transmission frequency substantially different from said characteristic resonant frequency of said inductive couple." Section 3.2.6.2 of the Qi-standard that Defendant's Product complies with states that "the Operating Frequency range of the half-bridge inverter is $f_{op}$= 115…205 kHz  (see Qi standard, Part 4, section 2.2.6.2). A higher Operating Frequency or lower duty cycle result in the transfer of a lower amount of power . . .. When a type A6 power Transmitter first applies a Power Signal (Digital Ping; see Section 5.2.1), it shall use an initial Operating Frequency of 175kHz (and a duty cycle of 50%)." Thus, by complying with the Qi-standard, Defendant's Product is configured and operable to produce said

oscillating driving voltage at a transmission frequency substantially different from said characteristic resonant frequency of said inductive couple.

31.    Based on the foregoing, Defendant's Product infringes at least Claim 1 of the '696 Patent.

### 3.    U.S. Patent No. 9,099,894

32.    Claim 1 of the '894 Patent reads:

1. A signal reception circuit for an inductive power outlet operable to regulate inductive power transmission across an inductive power coupling, the inductive power coupling comprising at least one primary inductive coil associated with the inductive power outlet and a secondary inductive coil associated with an inductive power receiver, the inductive power outlet comprising:

the at least one primary inductive coil connectable to a power supply;

at least one driver configured to provide an oscillating voltage across the at least one primary inductive coil; and

the signal reception circuit;

wherein the signal reception circuit comprises a monitor wired to the at least one primary inductive coil, the monitor configured to detect at least one coded signal generated by a signal transmission circuit of the inductive power receiver connecting an electrical element to the secondary inductive coil; the at least one coded signal detectable as a pulse in primary voltage or primary current, the pulse having an identifiable characteristic frequency.

33.   "A signal reception circuit for an inductive power outlet operable to regulate inductive power transmission across an inductive power coupling comprising at least one primary inductive coil associated with the inductive power outlet and a secondary inductive coil associated with an inductive power receiver, the inductive power outlet," of Claim 1 constitutes the preamble of the claim and therefore it is not a claim limitation.[3]

34.   To the extent "at least one primary inductive coil associated with the inductive power outlet" constitutes a claim limitation, Defendant's Product meets this limitation. Section 2 of the Qi-standard that Defendant's Product complies with shows that Defendant's product contains a primary inductive coil that is associated with a power transmitter as shown below:



35.   Defendant's Product contains "at least one primary inductive coil connectable to a power supply" as shown below:

---

[3] Even if considered a limitation it would be met by the Defendant's product.



Primary inductive
coil connectable
to a power supply

In addition, Section 2 of the Qi-standard that Defendant's Product complies with shows that this primary inductive coil is connectable to a power supply (aka the Power Transmitter):



A primary inductive coil associated with the inductive power outlet and a secondary inductive coil associated with an inductive power receiver.

36.   Defendant's Product contains "at least one driver configured to provide an oscillating voltage across the at least one primary inductive coil." In the image below, the FETs operate as a driver of the voltage to the coil and resonant capacitors, which are marked by red squares.



These drivers cause the voltage to oscillate at around 128 KHz. The tests performed on the Defendant's Product show that the voltage oscillates at 127 kHz as shown in the test equipment output  produced below:



37. Defendant's Product contains a "signal reception circuit." Section 3.2.6 of the Qi-standard that Defendant's Product complies with requires use of a Control and Communications Unit with the Power Transmitter in the Base Station which receives feedback signals from the inductive power receiver as shown in the diagram below:

**3.2.6 Power Transmitter design A6**



Figure 3-20: Functional block diagram of Power Transmitter design A6

In addition, Defendant's Product includes the label CV90326L. The controller data sheet associated with this part also includes a signal detector as shown in the image below:



© 2018 Shenzhen Chipsvision Micro Co.,Ltd.                                        May 10, 2018

Testing of Defendant's Product also confirms that Defendant's Product receives signals, as shown in diagram below, which shows the extracted received signal on

21

the output of envelope detection circuit and on entry to the controller. The blue line shows the current signal of the receiver with data modulated on it and the yellow line shows output of the envelope detection circuit of the transmitter:



38.    Defendant's Product meets the "wherein the signal reception circuit comprises a monitor wired to the at least one primary inductive coil" limitation. Section 5.3.4 of the Qi-standard that Defendant's Product complies with provides that "The Power Receiver shall set the Control Error Value to zero if the actual Control Point is equal to the desired Control Point. The Power Receiver shall set the Control Error Value to a negative value to request a decrease of the Primary Cell current. The Power Receiver shall set the Control Error Value to a positive

value to request an increase of the Primary Cell Current. Thus, the signal reception circuit must be able to monitor the primary induction coil. The signal reception circuit including the monitor in the Defendant's Product is on a single circuit board that also includes the primary coil and the primary coil and the signal reception circuit are electrically connected (wired) on the board as shown in the image below:



39.     Defendant's Product meets "the monitor configured to detect at least one coded signal generated by a signal transmission circuit of the inductive power receiver connecting an electrical element to the secondary inductive coil" limitation. Section 5.3.4 of the Qi-standard that Defendant's Product complies with provides that "In the power transfer phase, the Power Receiver controls the power

transfer from the Power Transmitter by means of control data that it transmits to the latter. For this purpose, the Power Receiver shall submit . . . packets." Thus, the signal reception circuit of the Defendant's Product is configured to detect the coded signals generated by the transmission circuit of the inductive power receiver.

40.     Defendant's Product meets "the at least one coded signal detectable as a pulse in primary voltage or primary current, the pulse having an identifiable characteristic frequency" limitation. This is confirmed by a test of Defendant's Product in which a test receiver sending Control Error 0 command every 100 milliseconds was placed on the transmitter. As can be seen the instruction signals are received and decoded in parallel with the carrier signal of the primary coil being active:



41.    Based on the foregoing, Defendant's Product infringes at least Claim 1 of the '894 Patent.

## C.    Defendant's Additional Infringing Products

42.    In addition to Defendant's Product, Defendant also sells the following products which practice the Qi standard:

- Yootech wireless charger qi-certified 7.5w wireless charging compatible with iphone xs max/xr/xs/x/8plus,10w for galaxy galaxy s10/s10 plus/s10e/s9 which is sold on at least walmart.com;

- Yootech wireless charger qi-certified 7.5w wireless charging compatible with iphone xs max/xr/xs/x/8/8 plus, 10w for galaxy note 9/s9/s9 plus which is sold on at least walmart.com;

- Yootech fast wireless charger, 10w qi-certified wireless charging stand,7.5w compatible with iphone xr/xs max/xs/x/8/8 plus, 10w fast charging galaxy s10/s10 plus/s10e/s9 which is sold on at least walmart.com;

- Yootech Wireless Charger Qi-Certified 10W Max Wireless Charging Stand, Compatible with iPhone SE 2020/11/11 Pro/11 Pro Max/XS MAX/XR/XS/X/8, Galaxy S20/Note 10 Plus/S10/S10 Plus which is sold on at least walmart.com;

- Yootech wireless charger qi-certified 7.5w wireless charging stand compatible with iphone xsmax/xr/xs/x/8/8 plus, 10w for galaxy s10/s10 plus/s10e/s9 which is sold on at least walmart.com;

- Yootech wireless charger qi-certified 7.5w wireless charging stand compatible with iphone xsmax/xr/xs/x/8/8 plus, 10w for galaxy s10/s10 plus/s10e/s9 which is sold on at least walmart.com;

- Yootech wireless charger, qi-certified 10w max wireless charging stand with qc3.0 ac adapter, compatible with iphone 11/11 pro/11 pro

max/xs/xr/xs max/x/8, galaxy note 10/note 10 plus/s10/s9/s8 which is sold on at least walmart.com;

- Yootech wireless charging bundle, qi-certified wireless charging pad stand, compatible with iphone xs max/xr/xs/x/ 8/plus/galaxy s10/s10 plus/s10e/s9 and more which is sold on at least walmart.com;

- Yootech Wireless Charger, Qi-Certified 10W Max Fast Wireless Charging Pad Compatible with iPhone 12/12 Mini/12 Pro Max/SE 2020/11 Pro Max, Samsung Galaxy S21/S20/Note 10/S10,AirPods Pro which is sold on at least amazon.com;

- Yootech Wireless Charger,Qi-Certified 10W Max Wireless Charging Stand, Compatible with iPhone 12/12 Pro/12 Mini/12 Pro Max/SE 2020/11 Pro Max, Galaxy S21/S20/Note 10 Plus/S10 Plus which is sold on at least amazon.com;

- Yootech [2 Pack] Wireless Charger Qi-Certified 10W Max Wireless Charging Stand, Compatible with iPhone 12/12 Pro/12 Mini/12 Pro Max/SE 2020/11 Pro Max, Galaxy S21/S20/Note 10/S10 Plus which is sold on at least amazon.com;

- Yootech Wireless Charger, Qi-Certified 10W Max Fast Wireless Charging Pad Compatible with iPhone 12/12 Mini/12 Pro Max/SE

2020/11 Pro Max, Samsung Galaxy S21/S20/Note 10/S10,AirPods Pro which is sold on at least amazon.com; and

- Yootech [2 Pack] Wireless Charger,Qi-Certified 10W Max Fast Wireless Charging Pad Compatible with iPhone 12/12 Mini/12 Pro Max/SE 2020/11 Pro Max,Samsung Galaxy S21/S20,AirPods Pro which is sold on at least amazon.com.

These products shall be referred to as "Defendant's Additional Products."

43.    On information and belief, Defendant's Additional Products operate in the same manner as Defendant's Product and therefore also infringe the '937, '696, and '894 Patents for the reasons explained above.

## D.    Defendant's Knowledge of the Patents-in-Suit

44.    In or around August 2020, Powermat sent a letter to Defendant informing Defendant of the existence of the patents-in-suit, that their products were covered by these patents, and informing Defendant that it needed a license to the patents. A true and correct copy of this letter is attached hereto as Exhibit D. In or around September 2020, Yootech acknowledged that it had received Powermat's letter. A true and correct copy of this correspondence is attached hereto as Exhibit E.

45.    Thus, Defendant has had actual knowledge of the patents-in-suit since at least August 2020.

28

## IV.   CLAIMS FOR RELIEF

## Count I: Infringement of U.S. Patent No. 9,006,937

46.     Powermat realleges the preceding paragraphs as though set forth fully herein.

47.     By making, using, offering for sale, and/or selling Defendant's Product and Defendant's Additional Products in the United States, Defendant is infringing at least claim 1 of the '937 Patent, under at least 35 U.S.C. § 271(a) either literally or under the doctrine of equivalents as explained above.

48.     Defendant's activities also constitute infringement of other claims of the '937 patent. Powermat has suffered damages as a result of the infringing activities of Defendant, and Powermat will continue to suffer damages as along as those infringing activities continue.

49.     Even though Defendant has notice of the '937 patent, Defendant continued its infringement of the '937 patent thereafter. Defendant's infringement has been willful, wanton and deliberate.

50.     Powermat has suffered damages as a result of the infringing activities of Defendant and will continue to suffer such damages as long as those infringing activities continue.

51.     Powermat has been, and will continue to be, irreparably harmed by Defendant's infringing conduct unless Defendant is enjoined by this Court.

29

52.    Powermat has no adequate remedy at law.

## Count II: Infringement of U.S. Patent No. 9,048,696

53.    Powermat realleges the preceding paragraphs as though set forth fully herein.

54.    By making, using, offering for sale, and/or selling Defendant's Product and Defendant's Additional Products in the United States, Defendant is infringing at least claim 1 of the '696 Patent, under at least 35 U.S.C. § 271(a) either literally or under the doctrine of equivalents as explained above.

55.    Defendant's activities also constitute infringement of other claims of the '696 patent. Powermat has suffered damages as a result of the infringing activities of Defendant, and Powermat will continue to suffer damages as along as those infringing activities continue.

56.    Even though Defendant has notice of the '696 patent, Defendant continued its infringement of the '696 patent thereafter. Defendant's infringement has been willful, wanton and deliberate.

57.    Powermat has suffered damages as a result of the infringing activities of Defendant and will continue to suffer such damages as long as those infringing activities continue.

58.    Powermat has been, and will continue to be, irreparably harmed by

Defendant's infringing conduct unless Defendant is enjoined by this Court.

59.     Powermat has no adequate remedy at law.

## Count III: Infringement of U.S. Patent No. 9,099,894

60.     Powermat realleges the preceding paragraphs as though set forth fully herein.

61.     By making, using, offering for sale, and/or selling Defendant's Product and Defendant's Additional Products in the United States, Defendant is infringing at least claim 1 of the '894 Patent, under at least 35 U.S.C. § 271(a) either literally or under the doctrine of equivalents as explained above.

62.     Defendant's activities also constitute infringement of other claims of the '894 patent. Powermat has suffered damages as a result of the infringing activities of Defendant, and Powermat will continue to suffer damages as along as those infringing activities continue.

63.     Even though Defendant has notice of the '894 patent, Defendant continued its infringement of the '894 patent thereafter. Defendant's infringement has been willful, wanton and deliberate.

64.     Powermat has suffered damages as a result of the infringing activities of Defendant and will continue to suffer such damages as long as those infringing activities continue.

65.     Powermat has been, and will continue to be, irreparably harmed by Defendant's infringing conduct unless Defendant is enjoined by this Court.

66.     Powermat has no adequate remedy at law.


## PRAYER FOR RELIEF

**WHEREFORE,** Powermat prays for judgment against Defendant as follows:

A.     A determination that Defendant has infringed U.S. Patent No. 9,006,937 literally or under the doctrine of equivalents;

B.     A determination that Defendant has infringed U.S. Patent No. 9,048,696 literally or under the doctrine of equivalents;

C.     A determination that Defendant has infringed U.S. Patent No. 9,099,984 literally or under the doctrine of equivalents;

D.     Awarding Plaintiff its damages, together with prejudgment interest and costs, and increasing those damages to three times the amount found or assessed as provided by 35 U.S.C. § 284;

E.     A determination that this case is exceptional within the meaning of 35 U.S.C. § 285, and awarding Plaintiff reasonable attorneys' fees and costs and disbursements in this action;

F.    Preliminary and permanently enjoining and restraining Defendant, its officers, directors, employees, agents, servants, successors, and assigns, and any and all persons acting in privity or in concert with Defendant from further infringement of U.S. Patent No. 9,006,937;

G.    Preliminary and permanently enjoining and restraining Defendant, its officers, directors, employees, agents, servants, successors, and assigns, and any and all persons acting in privity or in concert with Defendant from further infringement of U.S. Patent No. 9,048,696;

H.    Preliminary and permanently enjoining and restraining Defendant, its officers, directors, employees, agents, servants, successors, and assigns, and any and all persons acting in privity or in concert with Defendant from further infringement of U.S. Patent No. 9,099,894;

I.    An award of Plaintiff's taxable costs of this civil action, including interest;

J.    An award of any additional costs and disbursements incurred as a result of bringing this action; and

K.    Any such other, further, and additional relief that the Court deems reasonable.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all issues triable by a jury.

Date: July 14, 2021.                    Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Charles Ainsworth*
Charles Ainsworth
State Bar No. 00783521
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 418
Tyler, TX 75702
903/531-3535
charley@pbatyler.com

Mark A. Cantor (MI Bar #P32661)
Marc Lorelli (MI Bar #P63156)
Rebecca J. Cantor (MI Bar #P76826)
**BROOKS KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, MI  48075
Telephone: (248) 358-4400
Fax: (248) 358-3351
mcantor@brookskushman.com
mlorelli@brookskushman.com
rcantor@brookskushman.com

*Attorneys for Plaintiff*

</div>